Frazier, J.
In tbis proceeding the defendant is charged with a contempt of court on an information presented by a committee of the bar appointed by the court. To this information the defendant has pleaded not guilty. The information is as follows:
“That in the county of Muskingum and state of Ohio, on the 15th day of October, A. D. 1905, Ad Ellsperman, as publisher and managing editor and proprietor of the newspaper known as and entitled The Sunday News, which paper was and is published on each Sunday, and was and is generally circulated within the city of Zanesville, county of Muskingum, and state of Ohio, willfully and maliciously printed and published in said newspaper a certain false, libelous, scurrilous and scandalous article and cartoon or picture in substantially the words, figures, and'pictures following, to-wit: The following are the headlines:
“Infamous attempt of grand jury to blackmail to stop libel indictment.
“Grand jury tries blackmail scheme on publisher News to ward off a libel indictment.
“Shameless inquisitors wanted $300, and, because money was not forthcoming, they indicted Ellsperman—The Sunday Neivs sure of its position and ‘there’ll be something doing’ and that very shortly.
*594 “Three hundred dollars paid into the hands of the members of the grand jury, the chief inquisitors and probably one or two witnesses, would have saved the publisher of The Sunday News from indictment on the charge of criminal libel, originally brought by Harry L. Greiner, ex-county commissioner and a Times-Recorder stockholder.
“The proposal to pay over $300 to the grand jury, and by that means head off the indictment, was made three times by as many individuals, all of whom are well-known citizens.
“That an indictment was brought against the publisher of The Sunday News is due to the fact that he failed to accede to the shameless proposal.
“The indictment was made public last Monday afternoon, after examination had been made of the following witnesses: Harry L. Greiner, Frank B. Fell, W. O. Littick, Finley M. Fleming and Harry W. Cross.
“Three of the above named are ex-county commissioners, one business manager of The Times-Recorder Co. and the latter at one time editor of the News'.
“The whole business was ‘cocked and primed.’ With the exception of Mr. Cross, not one ol' the witnesses was friendly to the man against whom indictment was made.
“The end is not yet. There will be something doing in the very near future.
“The grand jury adjourned to meet November 13, after the election at which time it is expected to make inquiry into Y bridge grafts and other ‘minor’ questions.
“We will see what we will see.”
(The following is the article):
“The present grand jury which adjourned its sessions last Monday afternoon until November 13, is, according to evidence that can be and will be furnished, about as corrupt a jury as ever considered affairs in Muskingum county.
“This charge is not made for the reason that the publisher of The Sunday News has been indicted for criminal libel on two counts, but for the reason that he was thrice approached while the jury was in session and told that for a few hundred dollars he could stave off the indictment; that for a few hundred dollars the jury could be persuaded not to give consideration to the case of Harry L. Greiner v. Ad. Ellsperman and favorable to Ellsperman.
“One day last week the publisher of the Netos was approached by a prominent citizen who told him that he could save himself from an indictment at the hands of the grand jury if he would ‘dig down and fork over’ a few hundred dollars, but the proposition was not considered.
“On last Sunday evening, while the publisher of the News was at home assisting in the entertainment of a few friends, he was visited by another prominent citizen, who made a similar proposition, and advised that the matter be given consideration at once.
“ ‘A few hundred dollars will settle the matter,’ said the citizen, ‘and you may depend that the jury will not return an indictment against you.’
“Early Monday morning found the publisher of the News at the office of his attorney, who advised him to visit the gentlemen in order to determine just who and what was behind the move.
“Acting on his attorney’s advice, the gentleman was visited in his office and asked concerning the offer, whereupon information was given *595 that the matter had taken another form; that he could not talk oí it just then, but would be able to do so in fifteen minutes time.
“ ‘Get out of my office and get quick,’ was the way the gentleman expressed himself. ‘Go to your office at once and I’ll telephone you the particulars within fifteen minutes.’
“The publisher of the News acted upon the suggestion at once, but he had no sooner reached his office than a telephone message from a friend was received, announcing that he (the friend) had received a summons to appear before the grand jury at 9 o’clock.
“The matter had taken another turn.
“The few hundred dollars had not been forthcoming quite as readily as was expected.
“The grand jury was preparing to examine witnesses and render an indictment.
“The whole business had been ‘fixed.’
“The witnesses summoned to be examined were Harry B. Greiner, Frank B. Fell, W. O. Bittick, Finley M. Fleming and Harry W. Cross, three of them being ex-county commissioners, one business. manager of the Times-Recorder Co. and a business associate of Greiner, and the latter at one time editor of The Sunday News.
“There was considerable delay in the examination of the witnesses, occasioned, it was said, by the jury awaiting on a witness in another case. During the wait, however, George K. Browning, chief counsel for Harry L. Greiner, was seen to approach the door of the grand jury room, rap thereon, and when it was opened, hand in a bunch of papers.
“Browning bad prepared the indictments for the grand jury, and there was nothing left for the members to do but append their signatures thereto.
“Greiner was the first witness to be called, and he was followed by Cross. Then came Fell, Fleming and Bittick.
“At 3 o’clock in the afternoon the jury made its report, and among its findings was a charge of criminal libel against the publisher of The Sunday Neios. The charge contained two counts.
“It was quite evident after that that the ‘few huzidred dollars’ had failed to arrive on time.
““When the jury finished its labors, it adjourned to meet November 13—after the election—-at which time it is expected to make inquiry into Y bridge grafts. First of all, however, it was important that the publisher of the News be indicted—and for two reasons: First, because he failed to ‘salve’ the jury; and, second, because of the great moral (?) effect the indictment might have upon the forthcoming election.
.“Perhaps never before in the history of Muskingum county was anything so nicely ‘cocked and prizned.’ But it failed to work.
“Since that time the publisher has been criticised lor his failure to whack up, one citizen declaring in bold terms that he saved himself from indictment by ‘salving’ the jury.
“A few hundred dollars would have saved us, but we didn’t want to be saved that way. Since the indictment has been made we have been busy in an effort to get at the bottom of things, and with the result that we have succeeded pretty well. We do not care to ‘lay under’ any indictment thus made, and do not pi'opose to.
“From the time libel proceedings were begun, way last April, evei-ything pertaining thereto from the plaintiff’s standpoint has been extremely crooked. A Times-Recorder stockholder, in the person of Justice J. B. Carson, sat in the preliminary trial; an effort was made to *596 have the case tried before Judge Jennings, another Times-Recorder stockholder; refusal was made to the proposition to have the Times-Recorder’s stockholders read in court, every objection made by the plaintiff’s attorneys was sustained, and an effort was made to have the case thrown into the probate court after it passed from Carson’s hands.
“And then it came to pass that the grand jury was tampered with to the extent that it considered the question of libel in preference to considering the Y bridge grafts, lending color to the oft-repeated statement on the part of intelligent citizens that an indictment of libel would have a great moral (?) effect and probably save the day for the Republican county ticket.
“The people have not heard the last of this business.
“There is another day coming, and it’s coming soon.
“As above stated, the grand jury has been tampered with, and it is perhaps the most corrupt organization of its kind that ever gave consideration to Muskingum county’s affairs.”
• “That in connection with said written publication, the said Ad. Bllsperman in the said newspaper and in the same publication, printed and published the following cartoon pictures, with the words and figures thereon as appears as set forth below, and on the next page thereof:
‘ ‘ Cartoon showing a bloated, hideous form labeled grand juror over the dead body of the symbolical figure of justice, with the various placards at the side and over the head of the figure of the grand juror, as follows:
“Are you sued? We can fix you up right for ca?h.”
' “Verdict? made to order. Low prices. ?ati?faction a??ured or money refunded (perhap?). LEMERT & CO.”
“Anything we have at your own price. Ca?h.”
“Decision? cheap.”
“Come and see us if you have the price.”
“Don’t ri?k a trial without con?ulting u?. Why pay your ca?h to lawyer??”
“Our term? are ?trictly ca?h.”
“Justice a rare bargain, only ?300.”
“That prior to and at the time of said publication, certain cause or causes, in which said Ad. Ellsperman was charged with having published a criminal libel of and concerning one Henry L. Greiner, had been certified from the court of a justice of the peace in and for the city of Zanesville, said county, to the Court of Common Pleas of Muskingum County, and the grand jury of said county was prior to and at said date in session and engaged in the discharge of its duties in examining into crimes and offenses alleged to have been committed within the said county of Muskingum and state 'of Ohio; and at the time of said publication, said grand jury had found and presented two indictments against the said Ad. Ellsperman, in which said in *597 dietments said Ad. Ellsperman was charged with the offense of publishing a criminal libel against the said Henry L. Greiner, and said indictments are numbered 1327 and 1328 on the criminal docket of said Court of Common Pleas of Muskingum County, Ohio, and were pending at the time of said publication and are still pending in said court for disposition and trial according to law. And that said grand jury has not yet completed its work, and has, under the orders of the court, adjourned and suspended its work until the 13th day of November, 1905, when under the order of the court it will resume its work of examining into alleged crimes and offenses against the laws of the state of Ohio, alleged to have been committed in said county.
“That said newspaper article, words, figures, and pictures were false in all of its charges against the court, said grand jury, and the members thereof, and each member thereof, and that said publication of said article, words, figures, and pictures was' made with the intent to insult and intimidate and degrade the said court of common pleas as constituted and the grand jury and each member thereof, so in session as aforesaid, and engaged in the discharge of its duties under the order gf the court, and was intended to destroy the power and influence of said court and grand jury, and thus to bring the said court into contempt, and to inflame the prejudices of the people against the said court and grand jury, and to intimidate and prejudice the court and grand jury and the members thereof, and the jurors of the county who shall hereafter be impanneled for the trial of said indictments against the said Ad. Ellsperman, and to prevent a fair and impartial trial of the said indictment against the said Ad. Ellsperman.
“That the said Ad. Ellsperman printed and published in the said newspaper, The Sunday Netos, on the 15th day of October, 1905, the said false, scurrilous, and libelous article, words, figures, and pictures, as hereinbefore described and set forth, and circulated the same within the city of Zanesville and in and about the county, and throughout said county, amongst officers of the court, witnesses and jurors, and persons liable under the law to be impanneled in this court as jurors, and amongst the people generally, and thereby obstructed and still obstructs the administration of justice.
“And so the said relators charge and say that the said Ad. Ellsperman then and there -and thereby became and was and is guilty of contempt of this Court of Common Pleas of Muskingum County, Ohio, contrary to law, and against the peace and dignity of the state of Ohio.”
*598 It appears from the evidence introduced in this case that some time in April or May, 1905, two criminal eases were begun before J. B. Carson, justice of the peace, each charging the defendant with the offense of criminal libel. A hearing was had before said justice in each of said actions, with the result that the defendant in each of said actions was duly recognized to the court of common pleas of this county. In both cases, a transcript of the proceeding’s had in the justice’s court was filed in this court on the 6th day of June, 1905, and said causes were numbered 1327 and 1328 of the criminal causes of this court. The defendant, in each of said cases, entered into a recognizance for his appearance at the October Term of this court.
On the first day of the October Term of this court, to-wit. October 3, 1905, the present grand jury was duly impanneled, sworn and charged by the court. On the 11th of October the grand jury made a partial report of its work and took a recess until the 13th of November, 1905, at which time it was directed by the court to return. At the’ time the grand jury was impanneled the court charging the grand jury touching the law of criminal libel. This appears from the evidence introduced in this case.
Subsequently on the 11th day of October, 1905, the grand jury returned into this court an indictment in each of said cases, 1327 and 1328, charging the defendant with criminal libel. Those indictments' have been ever since said date, and are now, pending awaiting trial.
The articles and matters 'complained of as contempts were published in The Sunday News of October 15, 1905. The defendant admits that he is the proprietor and publisher of The Sunday News. He admits that before publication was made, he knew indictments were returned against him. Pie admits that he knew there would be headlines in The Sunday News, but testified that he did not compose and that he did not know what the headlines would be.
' The defendant admits that he saw and approved the article in question. He does not testify as to his knowledge of the cartoon.
*599 Not a syllable of testimony offered in the ease tended, in the remotest degree, to prove that any juror of the grand jury was corrupt or in any way connived at any blackmail or bribery or corruption or was in any manner guilty of any misconduct. The defendant offered no evidence to justify the headlines or the substance of his article or cartoon, that any grand juror had been approached by any person or that any member of the grand jury or the prosecuting attorney, directly or indirectly, made any attempt at blackmail or sought or solicited any bribe. Such evidence as he did offer at the hearing was upon the theory that it went to mitigation only.
Every member of the grand jury and the prosecuting attorney came upon the witness stand and testified not only that they were not guilty of the matters imputed to them, but that they had no knowledge or hint of the things imputed to themselves, and that they had no knowledge or hint of any misconduct on the part of anybody.
The most that the defendant claims is that, in conversations with Perry Smith, W. S. Bell, and with his attorney, he was led to believe that the grand jurors could be corrupted. Both of these persons, Smith and Bell, at the hearing testified denying that they had any such conversation with defendant as he claims, and his attorney made his professional statement in open court denying that he ever suggested to the defendant the matter of corrupting the grand jury to prevent an indictment against him. Even if the defendant’s claims are true and he had the conversation he claims he had with Smith, Bell and his attorney, there is not the least thing to show or to warrant any belief or assumption that the grand jury, or any member of it, was corrupt or attempted blackmail or bribery to prevent an indictment against him. The imputation against the grand jury was as baseless as it was vile, as unwarranted as it was malicious.
Assuming that the defendant had the conversations with Bell. Smith, and his attorney as he himself relates them, by what process of reasoning—I will not call it reasoning—by what process even a disordered imagination could have arrived at a conclusion that the grand jury was corrupt, I know not. It *600 is gratifying to the court, and must be gratifying to every lover of good government, order and decency, that there is not even the ghost of an attenuated shadow of a circumstance or fact offered in the evidence to warrant even an insinuation of corruption against that body or the officers with reference to the finding and return of said indictment, nor do his counsel claim there was.
Under the plea of not guilty, the defendant urges:
1. That the publication, cartoon and headlines do not constitute a contempt of court.
2. If the court should be of the opinion that the said publication and cartoon do constitute a contempt of court, the defendant makes public apology.
3. The defendant asserts that he did not intend any contempt of the court.
Counsel for the defendant contend that the matter published, including the cartoon, was spoken of the grand jury; that the work of the grand jury was completed when the indictments against the defendant were returned into court; that the matter being at an end so far as the grand jury was concerned, then no matter what the defendant might say of the grand jury, it was absolutely privileged and could not constitute a contempt of court.
If the language of the headlines, articles and cartoon appearing in The Sunday News can be interpreted only as a reflection upon the grand jury, and if it be assumed that the labors of the grand jury were at an end when the indictments were returned, then it must be conceded that .counsel for the defendant have some authority, to support their position, notably the case of Storey v. The State, found in 79 Ills., p. 45. Paragraph 4 of the syllabus of said case is as follows:
“The publication of a libel on a grand jury or on any member thereof in relation to an act already done by them in their official capacity, but which has no tendency directly to impede, embarrass, or obstruct the grand jury in the discharge of any of its duties remaining to be performed after the publication is made, can not be summarily punished as a contempt of court. ’’
*601 On the other hand, the Supreme Court of Indiana, in the ease of Fishback v. The State, found in 30 N. E. Reports, p. 1088, has decided directly to the contrary. The reasoning by which the Supreme Court of Illinois reaches its conclusion in the Storey case is diametrically opposed to the reasons advanced by our Supreme Court in the Myers case, 46 O. S., p. 491, and other Ohio eases, as to the inherent powers in courts of general jurisdiction to punish for contempt.
The Illinois ease, when carefully analyzed, will be found to have its limitations, viz.: That the matter published must relate solely to an act already done; that the matter published must have no tendency directly to impede, 'embarrass, or obstruct the grand jury in the discharge of its duties remaining to be performed after publication is made.
The present grand jury was in session, as shown by the records introduced, at the time the publication was made, it having been excused temporarily until the 13th' of November. The two reports of the grand jury prior to their' recess show, by their own terms, that they are partial reports only, not final. The grand jury, therefore, at the time of said publications, had labors yet before it unperformed. The article itself shows that the defendant knew that the grand jury was to resume its labors on the 13th of November, for it says, “The grand jury adjourned to November 13—after the election—at which time it is expected to make inquiry,” etc.
It is true that some courts have held that they acquire jurisdiction to punish for contempt only when the contempt relates to some matter pending before the court; that where publications and contemptous matters relate to an act of the court already done, then no matter how vile or infamous the attacks may be, the court is powerless to act by way of a contempt proceeding.
A recent decision of the Supreme Court of Missouri (1904) utterly refutes ¿nd repudiates this doctrine. This decision will be found in 99 American State Reports, beginning on page 624, and is more than fifty pages in length. The court, in this ease, reviews elaborately all the cases from the year books to the time of the decision, and asserts the law to be that—
*602 “1. Criminal contempts are all facts committed' against tlie majesty of the law or against courts as an agency of the government, and in which, therefore, the commonwealth and the whole people are concerned.
“2. Scandalizing a court is itself a criminal contempt, and the contempt need not relate to a cause that is still pending.
“3. The liberty of the press means that anyone can publish anything he pleases, but he is liable for the abuse of this liberty; if he does this by scandalizing the courts of his country, he is liable to be published for contempt of court. A newspaper article scandalizing the court and abusing one of the parties to a cause still pending by charging bribery and corruption is both a civil and a criminal contempt.”
In this decision, the court rests its conclusion upon the broad ground that it is a public wrong, a crime against the state, to libel a court, whether for present or past acts, because such conduct most effectually obstructs the free course of justice, tends to impair confidence in the administration of justice, and to destroy the power of courts so essentially necessary to the good order and well being of society.
I It is certainly strange reasoning that reaches a conclusion that conduct will constitute contempt that has reference solely to an act being done, while the same conduct referring to an act after it is done would not constitute a contempt. The difference exists in idea only; for whether before or after an act is done, libelous and contemptuous conduct has the same potency for evil. The injurious consequences, so far as the court and the public are concerned, are identically the same. Contemptuous conduct after an act of the court is just as effective to destroy the power and influence of the court, to impair public confidence in it, as before or during the progress of the act.
What is here stated is intimately related to another matter, viz., the so-called liberty of speech and press guaranteed by our Constitution. Newspapers have no greater rights than individuals. It is just as offensive against the law, morals and religion to lie in print as by the lips. By liberty of speech is not license to lie. Liberty in this connection does not mean licentiousness. The phrase ‘.‘freedom of speech,” means nothing more than freedom from censorship. Every one is privi *603 leged to speak or write what he pleases without the matter being vised by censors, but he is responsible for the abuses of that privilege. If that abuse is directed against a court, it becomes a contempt of court.
It was testified to by defendant and argued by his counsel, that the language and cartoon has no reference to the court, that it can be construed as having reference to the grand jury only. The grand jury is a component part of the court, itself in its ereminal jurisdiction and procedure. The grand jury is as essentially an instrumentality of the court as the judge who sits on the bench. Judges and grand juries come and go; change and die; the court lives. Libelous, scurrilous attacks upon a grand jury are, therefore, attacks upon the court itself. It might as well be said that a blow upon the arm of a person does not affect the body, as to say that an assault on a grand jury is not an assault on the court.
The gravamen of the charge contained in the information is that the defendant, by these publications and cartoons, hinders, obstructs, and impedes the due administration of justice, not only because they directly tend to impede, embarrass and obstruct the grand jury in the further prosecution of its labors, but that the matter complained of will likewise, directly tend to impede, embarrass and obstruct the due and orderly administration of justice with reference to the trial of the defendant upon the two indictments against him, to degrade the court, destroy its power and influence, to prejudice the people against the court, to lead them to believe that the indictments so returned by the grand jury are the result of fraud, blackmail, bribery, and that a trial on them will be nothing more than an outrage upon justice..
Criminal actions were pending in this court against the defendant ever since the time transcripts of the proceedings in the lower court were filed in this court. These criminal actions were pending before the grand jury and were by the grand jury simply transformed from the form of affidavits in the lower court into indictments in this court. The charges are the same, only different in form. The defendant knew that indictments were pending against him when he made his publications, and *604 all the matters published and the cartoon are an attack upon the justice and validity of the indictments in the actions pending against him: According to the publications and cartoon, the indictments are- the result of bribery, corruption, and for base political purposes. The said publications, headlines and cartoon directly tend to enhance the difficult of securing an impartial jury to try the indictments, and thereby impede and hinder the due and orderly administration of justice.
As is stated in the Myers case, by our own Supreme Court, the defendant “was not justified in resorting to such means to right any real or imaginary wrong in respect to the finding of an indictment. An indictment secured by improper means or by an illegal body can be reached and set aside by plea in abatement which searches the record.” (46 O. S., p. 490.)
The contempt complained of is technically termed an indirect or constructive contempt, i. e., one not occurring in the immediate presence of the court. It is stated by Bishop in his work on Criminal Law, Volume 2, Section 259:
“The general doctrine is, any publication whether by parties or strangers, relating to a cause in court, which tends to prejudice the people as to its merits, to embarrass the administration of justice, may be visited as a contempt, and this includes reflections on the tribunal or its proceedings, or on the parties, the jurors, the witnesses or the counsel.
“Among the inherent powers of a court of superior jurisdiction is that of maintaining its dignity, requiring obedience to its process, rebuking interference with its business, and punishing unseemly behavior. This power is essential to the very existence of the court.”
The duties of a grand juror are irksome at best. Most men dislike such service and seek to avoid it. The position becomes all the more unbearable if it is understood that the grand jurors can be assailed and villified for their acts through the press.
After a careful consideration of the whole matter, upon review of all the authorities, I am satisfied that the matter complained of constitutes a contempt of court and that no improper evidence was admitted at the hearing. The defendant through his counsel *605 stated that he did not intend to be in contempt. It is a principle of law that every one is held to intend the natural and reasonable consequences of his own voluntary acts, unless the facts and circumstances proved show the contrary. My judgment is that the natural, probable and direct effect of the matters complained of was to impede the grand jury in the further progress of its labors, to embarrass the due and orderly administration of justice with reference to the pending cases of the defendant, and was an outrageous insult to the grane jury, which is a part of the court itself.
John J. Adams, John li. Stonesipher and John Whartenby, for plaintiff.
Eugene O’Neal and H. B. Shepard, for defendant.
It is said by the court in the Fishback case that:—
“If the article was per se libelous, admitting of but one fair and reasonable construction and requiring no inuendo, then it would be trifling with justice to say that in such a case the publisher could admit the publication but deny the plain and unmistakable meaning,of that which the language used conveys. ’ ’
The language used in the headlines and articles, and the imputations in the cartoon are libelous per se.
As proprietor and manager of The Sunday News, the defendant must be held responsible, for the injurious consequences of the defamatory matter appearing in his newspaper. All authorities agree upon this proposition.
What punishment should be meted out to the offender ?
After careful consideration of the whole matter, I have determined that the sentence in the present case shall be that the defendant pay a fine of $250 and the costs of prosecution and that he stand committed to the work house until said fine and costs are paid or secured to be paid or defendant be otherwise discharged as provided by law.